IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

TAILGATE BEER, LLC,                )
                                   )
        Plaintiff,                 )
                                   )        NO. 3:18-cv-00563
v.                                 )        JUDGE RICHARDSON
                                   )
BOULEVARD BREWING COMPANY,         )
                                   )
        Defendant.                 )

## <u>MEMORANDUM OPINION</u>

Pending before the Court is Plaintiff Tailgate Beer, LLC ("TailGate")'s Motion for Preliminary Injunction (the "Motion"), filed on June 19, 2018. (Doc. No. 3). Defendant Boulevard Brewing Company ("Boulevard") responded (Doc. No. 41), and Tailgate replied. (Doc. No. 47). TailGate also filed a supplemental brief in support of its Motion. (Doc. No. 88). The Court held a hearing on the Motion on September 20, 2019, and the Court permitted additional post-hearing briefing on any matters not addressed during the hearing. (Doc. Nos. 113, 114). For the reasons discussed below, TailGate's Motion for Preliminary Injunction with be denied.

## **BACKGROUND**[1]

a. Factual History[2]

TailGate is a local Nashville brewery and distributor of small batch craft beer. (Doc. No. 4 at 1). TailGate originally opened as a brewery and beer distributor in San Diego, California in 2007. (*Id.* at 2). In 2014, TailGate moved its operation to Nashville, Tennessee. (Doc. No. 4 at 6). In 2016, TailGate opened a second taproom in Nashville, Tennessee. (*Id.*). Currently, TailGate operates three locations in the Nashville area. At this time, except for limited sales in the United Kingdom and Sweden, TailGate does not sell or distribute its beer outside of Tennessee. (Doc. No. 41 at 7).

On March 5, 2013, the U.S. Patent and Trademark Office ("USPTO") issued TailGate U.S. Trademark Registration No. 4298625 for its TailGate Logo (the "TailGate Mark"):



---

[1] The following facts, unless somehow qualified herein, are taken as true for purposes of the Motion, because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

[2] Facts cited herein from the pleadings and motions are consistent with the facts adduced and evidence admitted during the September 20, 2019 hearing on Plaintiff's Motion for Preliminary Injunction (the "Preliminary Injunction Hearing" or "Hearing").

(Doc. No. 4-1, Ex. A). The TailGate Mark features a pickup truck parked at a particular angle, featuring, among other things, a lowered tailgate and a beer keg in the bed of the truck. (Doc. No. 4-1, Ex. D). When marketing specific beers, TailGate often imposes other images into the bed of the truck. (*Id.*). For example, at the Preliminary Injunction Hearing, Wesley Keegan, TailGate's founder and owner, testified that a can of TailGate's Peanut Butter Milk Stout displays in the truck bed a cow with its hoof in a jar of peanut butter. The TailGate Mark is printed on various items including, but not limited to, TailGate's beer cans, taps, glassware, and merchandise available for sale on TailGate's online store. (*Id.*). The TailGate Mark is also displayed on the TailGate website and used in promotions, marketing, and advertising. (Doc. No. 1-4).

In 2013, the USPTO issued TailGate U.S. Trademark Registration No. 4280254 for the stylized mark "TailGate Beer" (the "TailGate Wordmark"):



(Doc. No. 4-1, Ex. B).

In addition, in 2010, TailGate obtained U.S. Copyright Registration No. VA0001751100 for the work it calls the TailGate Beer Logo ("Copyrighted TailGate Logo"):



(Doc. No. 4-1, Exhibit C). The Copyrighted TailGate Logo appears to be a colored version of the TailGate Mark. TailGate also obtained U.S. Copyright Registration No. TXU001734540 for certain text, artwork, and photographs appearing on the TailGate Beer Website. (*Id.*).

Boulevard was founded in 1989 and is a beer distributor and brewery that sells craft beer. (Doc. No. 4 at 7). Relatively recently, Boulevard rebranded its Pale Ale Beer and replaced the label with a new label featuring the image with which Tailgate takes issue here (the "Pale Ale Image"):



(Doc. No. 4 at 4). The Pale Ale Image is owned by IPack S.A.R.L. ("IPack"), a company related to Boulevard.

TailGate also takes issue with Boulevard's "Palegate" advertising campaign (the "Palegate Advertisement"):



(Doc. No. 4 at 9). The Palegate Advertisement promoted a sweepstakes awarding tickets to a Kansas City Royals home baseball game and was directed only to residents of Missouri, Kansas, Iowa, and Nebraska (Doc. No. 41 at 17).

Although Boulevard sells its beer in Tennessee, including in 47 locations within 10 miles of TailGate's original taproom and 74 locations within 10 miles of TailGate's second location (Doc. No. 4 at 7), Boulevard does not sell its Pale Ale in Tennessee (Doc. No. 41 at 8).

TailGate became aware of the Pale Ale Image through a customer who, during a trip to Kansas City, saw the Pale Ale Image and believed it to be the TailGate Mark. (Doc. No. 4-1, Ex. D). When TailGate discovered the Pale Ale Image, TailGate contacted Boulevard and demanded that Boulevard stop using the image, which they deemed to be "unmistakably similar to the [TailGate] Mark." (Doc. No. 4 at 4). On March 12, 2018, IPack filed a petition with the USPTO to cancel TailGate's trademark, alleging the trademark has been abandoned (the "Cancellation Proceeding"). (Doc. 97-4 at 2). That petition is currently pending before the Trademark Trial and Appeal Board ("TTAB"). Also before the TTAB is a proceeding filed by TailGate opposing IPack's application for the registration of the Pale Ale Image ("Opposition Proceeding"). The TTAB issued an order staying both proceedings pending final disposition of this action. (Doc. No. 97-7).

b. Procedural History

On June 19, 2018, Trademark filed its Complaint, setting forth the claims described below. (Doc. No. 1). That same day, it also filed a Motion for Preliminary Injunction. (Doc. No. 3). Boulevard responded to the Motion on September 19, 2018. (Doc. No. 41). TailGate replied to Boulevard's response on September 26, 2018. (Doc. No. 47). On June 5, 2019, a hearing on Plaintiff's Motion for Preliminary Injunction was scheduled for August 23, 2019. (Doc. No. 77).

On June 19, 2019, the parties filed a joint motion to continue the Preliminary Injunction Hearing due to previously scheduled and unmovable commitments for Boulevard. (Doc. No. 78). On August 16, 2019, the Hearing was rescheduled to September 20, 2019. (Doc. No. 16).

The Preliminary Injunction Hearing was held, and concluded, on September 20, 2019 as scheduled. During the Hearing, the parties informed the Court that within a few weeks thereafter they would submit possible trial dates. The Parties suggested that they would likely propose a date roughly nine months from the date of the Hearing. They later proposed to the Court a target trial date no earlier than roughly nine and a half months from the date of this Memorandum Opinion. (Doc. No. 116 at 8).

## LEGAL STANDARD

The Sixth Circuit has held that the district court must balance four factors when considering a motion for preliminary injunction under Federal Rule of Civil Procedure 65: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to the opposing party or others; and (4) whether the public interest would be served by the issuance of the injunction. *Bays v. City of Fairborn*, 668 F.3d 814, 818–19 (6th Cir. 2012). "The party seeking a preliminary injunction bears a burden of justifying such relief, including showing irreparable harm and likelihood of success." *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014) (quoting *Michigan Catholic Conf. & Catholic Family Servs. v. Burwell*, 755 F.3d 372, 382 (6th Cir. 2014)). "No single factor is a prerequisite to the issuance of a preliminary injunction; rather the Court must balance all four factors." *Young v. Giles Cnty. Bd. of Edu.*, 181 F. Supp. 3d 459, 463 (M.D. Tenn. 2015) (citing *Neveux v. Webcraft Tech., Inc.*, 921 F. Supp. 1568, 1570–71 (E.D. Mich. 1996)). However, a plaintiff must always demonstrate an

irreparable injury before a preliminary injunction may issue. *Id.* (citing *Neveux*, 921 F. Supp. 3d at 1571).[3]

**<u>ANALYSIS</u>**

In its Complaint, TailGate claims that Boulevard's use of the Pale Ale Image on the label of its pale ale craft beer and in the Palegate Advertisement violates federal and common law. Specifically, TailGate asserts federal claims for trademark infringement, 15 U.S.C. § 1141, false designation of origin, 15 U.S.C. § 1125(a), and copyright infringement, 17 U.S.C. §§ 106 et seq., 501, and common law claims for trademark infringement and false designation of origin. (Doc. No. 1).

At this juncture, the Court is not deciding the ultimate merits of TailGate's case against Boulevard. Rather, the Court is called upon to determine whether TailGate has presented evidence sufficient to show that a preliminary injunction is warranted at this time. As discussed below, the Courts answers that question in the negative; TailGate has failed to show that the extraordinary remedy of a preliminary injunction is warranted in this case. TailGate's evidentiary showing and argument collectively fall short on two critical factors: (1) strong likelihood of success on the merits and (2) irreparable harm.

1. Likelihood of Success on the Merits

    A. Trademark Infringement

Under the Lanham Act, trademark infringement occurs when "any person...without the consent of the registrant[,] use[s] in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or

---

[3] The Court realizes that if this proposition is true—and the Court will proceed as if it is—then the proposition in the prior sentence is inexact inasmuch as there is one factor—irreparable injury—that actually is a prerequisite to the issuance of a preliminary injunction.

advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive[.]" 15 U.S.C. § 1114(1). "To state a claim for trademark infringement under the Lanham Act, a plaintiff must allege facts establishing that: (1) it owns the registered trademark; (2) the defendant used the [allegedly infringing] mark in commerce; and (3) the use was likely to cause confusion." *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 609 (6th Cir. 2009) (citing 15 U.S.C. § 1114(1)). The second element is not at issue here since the parties do not dispute that Boulevard used the allegedly infringing mark in commerce.

TailGate claims that it has established the first element—that it owns the trademark— because the TailGate Mark is registered to TailGate by the USPTO, bearing registration number 4298625. (Doc. No. 4 at 14; Doc. No. 114 at 2). Boulevard disagrees, arguing that this element is not satisfied because TailGate's trademark is not valid. (Doc. No. 41 at 3). According to Boulevard, the TailGate Mark is not valid because TailGate has abandoned the federal registration and because this trademark has not been and is not currently used in interstate commerce. (*Id.* at 3-9). Under the Trademark Manual of Examining Procedure, "[i]f a mark has not been in use for three consecutive years and the holder has done nothing to try to resume use of the mark, the USPTO may presume that the holder has abandoned the mark." TMEP § 1613.11 (quoting 15 U.S.C. § 1127). The validity of TailGate's trademark due to abandonment and use in interstate commerce is at issue in the proceedings before the TTAB, which, as discussed above, are currently stayed pending final disposition of this action. (Doc. No. 97-7). TailGate argues that the issues before the TTAB are irrelevant to the proceedings before this Court. (Doc. No. 47 at 4). Although the Court believes that the abandonment and cancellation issues are relevant to whether TailGate owns the registered trademark, because the Court finds that there is no likelihood of confusion, it need not address the abandonment and cancellation issues at this time.

As for the third element, TailGate asserts that it is likely to succeed on the merits because Boulevard's use of the Pale Ale Image is likely to cause confusion with TailGate's federally registered trademark. The Sixth Circuit has developed an eight-factor test to evaluate, based on the circumstances of each case, whether confusion is likely. *Frisch's Rests., Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642, 648 (6th Cir. 1982). The eight factors this Court considers are: "(1) strength of the plaintiff's mark; (2) relatedness of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) defendant's intent in selecting the mark; [and] (8) likelihood of expansion of the product lines." *Id.* Although all relevant factors must be considered, similarity and the strength of the mark are the most important factors. *Maker's Mark Distillery, Inc. v. Diageo N. Am., Inc.*, 679 F.3d 410, 424 (6th Cir. 2012) (citing *Gray v. Meijer, Inc.*, 295 F.3d 641, 646 (6th Cir. 2002)).

The Court finds that these factors as a whole weigh against a likelihood of confusion.

### i. Strength of Plaintiff's Mark

"The strength of a mark is a factual determination of the mark's distinctiveness. The more distinct a mark, the more likely is the confusion resulting from its infringement, and therefore, the more protection it is due." *Frisch's Rest., Inc. v. Shoney's Inc.*, 759 F.2d 1261, 1264 (6th Cir. 1985); *Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1117 (6th Cir. 1996) ("The stronger the mark, the more likely it is that encroachment on it will produce confusion."). To evaluate the strength of the TailGate Mark, this Court considers two separate elements: "(1) 'conceptual strength', or 'placement of the mark on the spectrum of marks', which encapsulates the question of inherent distinctiveness; and (2) 'commercial strength' or 'the marketplace recognition value of the mark.'" *Maker's Mark*, 679 F.3d at 419 (quoting 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 11.83 (4th ed.)). Although these

elements are analyzed independently, the Court must consider the interplay between the mark's conceptual strength and commercial strength. *Id.* In other words, although a trademark may be fundamentally unique, the full strength of the mark depends on the scope of commercial recognition. *See id.*

To determine a mark's conceptual strength, courts often place a trademark into one of four categories, from strongest to weakest: (1) arbitrary and fanciful; (2) suggestive; (3) descriptive; and (4) generic. *Burke–Parsons–Bowlby Corp. v. Appalachian Log Homes, Inc.*, 871 F.2d 590, 593-94 (6th Cir. 1989). The distinctiveness of a mark is premised upon the category into which it is placed. The most distinctive kind of mark, "[a]n arbitrary mark[,] has a significance recognized in everyday life, but the thing it normally signifies is unrelated to the product or service to which the mark is attached, such as CAMEL cigarettes or APPLE computers."[4] *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Ctr.*, 109 F.3d 275, 280 (6th Cir. 1997).

The next strongest kind of mark, a suggestive mark, is one that (as the name implies) "suggests rather than describes an ingredient or characteristic of the goods and requires the observer or listener to use imagination and perception to determine the nature of the goods." *Champions Golf Club*, 78 F.3d at 1117 (quoting *Induct–O–Matic Corp. v. Inductotherm Corp.*, 747 F.2d 358, 362 (6th Cir. 1984)) (internal quotation marks omitted).

The TailGate Mark clearly is either arbitrary or suggestive, and the Court concludes with relative ease that it is suggestive. The TailGate Mark consists of the TailGate Wordmark and the image of the truck with its tailgate lowered and its bed containing a keg of beer and other items—

---

[4] Also in this same category of the strongest kind of mark is a "fanciful" mark, which generally refers to a made-up word signifying nothing other than the product or service to which it is attached, such as "Exxon" or "Kodak" *Champions Golf Club*, 78 F.3d at 1117. The TailGate Mark is not such a mark.

a charcoal grill and a cooler—which the Court concludes are associated in the general American public's mind with social gathering where beer typically is present. Although the word "tailgate" and the corresponding elements of the image have everyday meanings, those meanings are not precisely indicative of the beer with which they are associated via the TailGate Mark, so the mark is not descriptive. By the same token, however, the TailGate Mark is not arbitrary because, with some imagination (as to what the depicted scene as a whole is connoting) and perception (again, as to what the whole scene is connoting but also as to what the individual components of the scene are), an observer can understand that the associated product is beer. Among other things, the Court believes it is no mystery that beer is not infrequently associated with so-called "tailgating" events at which a pickup's tailgate is down to permit access to the party accoutrements, which are also not infrequently associated with beer, including a keg, a charcoal grill, and a cooler.

Because the TailGate Mark is suggestive, it is inherently distinctive. *See* § 11:2 Spectrum of distinctiveness of marks—Placement of candidates on the spectrum, 2 McCarthy on Trademarks and Unfair Competition § 11:2 (5th ed.) ("Generic terms can never be trademarks, descriptive terms are not inherently distinctive[,] and suggestive, arbitrary[,] and fanciful terms are regarded as being inherently distinctive."). *Accord Ausable River Trading Post, LLC v. Dovetail Sols., Inc.*, 902 F.3d 567, 570 (6th Cir. 2018) (noting, as to arbitrary and fanciful, as well as descriptive, have an intrinsic nature that serves to identify a particular source of a product.). Thus, the TailGate Mark is conceptually strong, though not as conceptually strong as it would be if it were arbitrary.

To determine a mark's commercial strength, courts look to consumer surveys, proof of marketing, and proof as to whether third parties have extensively used a trademark or similar trademarks in the relevant market. *Progressive Distribution Services, Inc. v. United Parcel Service, Inc.*, 856 F.3d 416, 420 (6th Cir. 2017). Although "[s]urvey evidence is the most persuasive

evidence of commercial recognition . . . [,] it is by no means a requirement." *Id.* Courts also look to whether the mark has been subject to "wide and intensive advertisement." *Homeowners Grp, Inc. v. Home Mktg. Specialists, Inc.*, 931 F.2d 1100, 1107 (6th Cir. 1991). "The absence of any advertising, . . . , diminishes the likelihood that most people will be familiar with a company's mark, absent evidence that its goods or services have achieved broad public recognition." *Therma-Scan, Inc. v. Thermoscan, Inc.*, 295 F.3d 623, 632 (6th Cir. 2002). Finally, if proof exists that third parties have used the trademark or similar trademarks in the relevant market, the commercial strength of plaintiff's trademark is likely weak. *Progressive Distribution*, 856 F.3d at 430.

According to TailGate, "the image of the truck with its tailgate lowered is distinct and has a high degree of recognition in the craft beer market." (Doc. No. 4 at 15). In support of this argument, however, TailGate cites only to statements in Mr. Keegan's declaration that TailGate created the TailGate Mark in order to evoke "an emotion or memory of enjoying a beer during the act of tailgating and interacting in a social setting with friends and family" and the company "believe[s] [they] have developed a distinctive mark that should prevent other beer companies from attempting to use similar images that would confuse customers." (Doc. No. 4-1, Ex. D). TailGate does claim that "[t]he [TailGate] Mark is present throughout Plaintiff's taprooms and on its glassware, website, beer cans, and items available for sale in its online store." (Doc. No. 4 at 6). And, at the Preliminary Injunction Hearing, Mr. Keegan testified that the word "tailgate" is pervasive throughout TailGate's merchandise and taproom. However, TailGate has provided no survey evidence, proof of marketing, or otherwise shown that the TailGate Mark has achieved broad public recognition. Therefore, although the TailGate Mark is distinctive, the record is devoid of probative evidence of widespread recognition supporting the strength of its mark. Accordingly, this factor weighs in Boulevard's favor.

ii. Similarity of the Marks

As noted above, the similarity of a plaintiff and defendant's marks "is 'a factor of considerable weight.'" *AutoZone, Inc. v. Tandy Corp.*, 373 F.3d 786, 795 (6th Cir. 2004) (quoting *Daddy's Junky Music*, 109 F.3d at 283). "In assessing similarity, 'courts must determine whether a given mark would confuse the public when viewed alone, in order to account for the possibility that sufficiently similar marks may confuse consumers who do not have both marks before them but who may have a general, vague, or even hazy, impression or recollection of the other party's mark.'" *Maker's Mark*, 679 F.3d at 421 (citing *Daddy's Junky Music,* 109 F.3d at 283). "The words in a mark and the mark's appearance are appropriate considerations." *Citizens Banking Corp. v. Citizens Financial Group, Inc.*, 320 F. App'x 341, 348-49 (6th Cir. 2009). In reviewing the words in a mark, courts consider the "pronunciation, appearance, and verbal translation of conflicting marks." *Daddy's Junky Music,* 109 F.3d at 283. Finally, "courts must view marks in their entirety and focus on their overall impressions, not individual features." *Id.*

TailGate argues that the TailGate Mark and Pale Ale Image "are virtually identical," claiming that both "depict a truck in the same position with the tailgate lowered and a beer keg in the back," and "give off the same feel and thus have a strong similarity." (Doc. No. 4 at 16).[5] The

---

[5] TailGate also argues that the font Boulevard used in its Palegate Advertisement is copied from the font and style in the TailGate Mark. (Doc. No. 4 at 16). In *AutoZone, Inc. v. Tandy Corp.*, the Sixth Circuit compared the "AUTOZONE" mark with Tandy Corporation's "POWERZONE" mark. 373 F.3d at 796. The court considered the capitalization of the letters, the pronunciation of each syllable, the font, and the design of the words. *Id.* The court found that although the marks had some visual and linguistic similarities, ultimately their differences outnumbered their similarities such that the likelihood of confusion was small. Here, the Court finds that any similarity between the font of the TailGate Mark and the Palegate Advertisement falls far short of proving the marks are similar. First, the words "TailGate" and "Palegate" are distinct in pronunciation, appearance, and translation. As in *AutoZone*, the pronunciation of only one syllable is similar. Second, as discussed further below, although both fonts are generally bold and capitalized, the letters in Palegate are uniquely stylized. Accordingly, the Court does not find persuasive TailGate's argument that similarity between the fonts is likely to evoke confusion.

Court disagrees. As an initial matter, TailGate does not support the notion that the marks "give off the same feel." Rather, its argument inaptly focuses on the marks' individual features, namely the trucks and beer kegs. Absent from TailGate's argument is any comparison of the total effect of each design. *See WLWC Centers, Inc. v. Winners Corp.*, 563 F. Supp. 717, 725 (M.D. Tenn. 1983). Furthermore, after separately reviewing the TailGate Mark and the Pale Ale Image, the Court finds that the overall impressions created by the marks are, in fact, dissimilar. Although both images portray a pickup truck facing the same direction with a keg in the bed and with a lowered tailgate, in the Court's view the respective impressions conveyed to the ordinary consumer by each logo are distinct. Because the Court must examine the totality of a mark instead of only the mark's "prominent feature," the Court will consider both the words and images portrayed on the marks. *See Little Caesar Enters., Inc. v. Pizza Caesar, Inc.*, 834 F.2d 568, 571 (6th Cir.1987) (noting that emphasis on the "prominent" feature of a mark rather than on its totality violates the rule against comparing dissected components of a mark).

Regarding the wordmarks on each image, unquestionably the words "TailGate Beer" and "Boulevard Pale Ale Our Original" are distinct in pronunciation, appearance, and translation. Although both marks use a variety of block lettering, there are also visual differences in the words on each mark.

The TailGate Mark concentrates all of the words above the pickup truck. The "T" in "TAILGATE" is significantly larger than the other letters, which appear to be the same size as one another except insofar as the "L" is largest inasmuch as it sweeps underneath the letters "GATE." The letters are arranged in a slight arch with the "G" at the arch's crown. The word "BEER" is settled below the "L" in "TAILGATE" tracing the arch of the "L". The design gives an impression of a badge with a ribbon warped around the top.

The wordmarks on the Pale Ale Image are different. The words "BOULEVARD" and "PALE ALE" sit on top of the pickup truck while the words "OUR ORIGINAL" are displayed below. All of the letters in "BOULEVARD" are the same size as one another and are displayed in a narrow arch. The words "PALE ALE" are centered on the mark and the letters descend in size as they move inward. Finally, the words "OUR ORIGINAL" are contained in a separate box in solid letters. The Pale Ale Image leaves an impression of a stamp.

The Court also has analyzed whether the pickup truck images are sufficiently similar as to convey the same impression to consumers. The Court finds that the TailGate Mark conveys—as Mr. Keegan intended—a tailgate (also known as a "tailgate party")[6] and social interaction with friends and family. (Doc. No. 4-1 at 28). Although TailGate repeatedly describes the TailGate Mark as "featuring a tailgate lowered and a beer keg in the bed of the truck," (Doc. No. 4 at 1), the bed of the truck also holds a functioning grill, cooler, two glasses of beer, two beer cans on ice, and a "tapped" keg. (Doc. No. 4-1 at 2). The combination of these elements creates the impression of an ongoing tailgate party with beer. Further, the TailGate Mark is zoomed in on the bed of the truck, concentrated in such a way as to make the viewer feel that they are participating in the tailgate. In comparison, the Pale Ale Image features the whole truck from a wide angle of view. The truck—a seemingly old model—appears in the distance, suggesting the viewer is not involved in the scene but is rather viewing the scene from afar—from a distance, spacially or perhaps even temporally. The image contains only the truck and keg and thus no grill, cooler, cans, or glasses, and thus conveys—as Boulevard intended—delivery of beer. (*See* Doc. No. 41 at 8 n.4)

---

[6] Merriam-Webster's online dictionary, under the third definition for the noun "tailgate," states: "US: tailgate party// Nowadays, tailgates have evolved into mobile feasts: face-to-face social networks where complete strangers bond over food and drink, and everyone is eager to share." Accessible at https://www.merriam-webster.com/dictionary/tailgate (last accessed Oct. 10, 2019). This scene is what the TailGate Mark suggests.

(explaining that Boulevard's first beer was delivered to a local Kansas City restaurant in the back of a pickup truck)). In the bed of the pickup truck of the Pale Ale Image, there is only one "untapped" keg. Nothing in this rather spartan image suggests a tailgate party, with its typical cornucopia, which the TailGate Mark conveys.

Thus, the Court finds that the similarity factor does not support a finding of likelihood of confusion and, therefore, weighs in favor of Boulevard.

### iii. Relatedness of the Goods

Courts in the Sixth Circuit characterize cases into three categories regarding the relatedness of the goods and services of the parties: (1) if the parties compete directly by offering their goods or services, confusion is likely if the marks are sufficiently similar; (2) if the goods or services are somewhat related but not competitive, the likelihood of confusion will turn on other factors; and (3) if the goods or services are totally unrelated, confusion is unlikely. *See Daddy's Junky Music*, 109 F.3d at 282. "The relatedness inquiry therefore focuses on whether goods or services with comparable marks that are similarly marketed and appeal to common customers are likely to lead consumers to believe that they come from the same source, or are somehow connected with or sponsored by a common company." *Therma-Scan*, 295 F.3d at 633 (internal quotation marks and citation omitted). And, in order to appeal to a common customer, the parties must be located in or sell to buyers in the same geographic region. *See KeyCorp v. Key Bank & Trust*, 99 F. Supp. 2d 814, 824 (N.D. Ohio 2000) (finding relatedness of the goods was neutral where although the parties' services were somewhat similar, the parties did "not compete directly in any state or region").

The parties here do not fall neatly into any one category. Although they offer the same goods—craft beer and corresponding merchandise—TailGate and Boulevard Pale Ale do not

directly compete. Boulevard Pale Ale is not sold in Tennessee (Doc. No. 41 at 8), and TailGate sells its beers only in Tennessee and, to a limited degree, the United Kingdom and Sweden. (Doc. No. 41 at 7). And, when the goods or services offered by two companies are somewhat related, but not competitive, the likelihood of confusion will turn of other factors. *Daddy's Junky Music*, 109 F.3d at 282. For example, in *Champions Golf Club, Inc.*, the Sixth Circuit held that even though two golf clubs provided nearly identical services, "that does not resolve the question of the 'relatedness' of the services the two clubs offer." *Id.* at 1118. In order to determine the relatedness of the services, the Sixth Circuit stated, the district court should have considered whether the two clubs were in direct competition. *Id.* Because the products here are related but the parties do not compete directly in the same state or geographic region, the Court finds that the likelihood of confusion will depend on other factors and that the relatedness factor is, therefore, neutral.

iv.  Evidence of Actual Confusion

Although evidence of actual confusion is the best evidence of likelihood of confusion, a lack of such evidence is rarely significant in determining whether confusion is likely because such evidence is difficult to secure. *See Daddy's Junky Music*, 109 F.3d at 284. Nevertheless, an absence of actual-confusion evidence or "the existence of only a handful of instances . . . after a significant time or a significant degree of concurrent sales under the respective marks may . . . lead to an inference that no likelihood of confusion exists." *Homeowners*, 931 F.2d at 1110.

Here, TailGate has presented a single incident of actual confusion by a customer. In approximately February 2018, a TailGate customer who frequented the Nashville TailGate taproom traveled to Missouri and came across a Boulevard Pale Ale. Upon returning, the customer told Mr. Keegan that he had seen TailGate beer while visiting Missouri. (*See* Doc. No. 4 at 16).

TailGate argues that this incident suggests there is actual consumer confusion in the marketplace. Defendant argues that this isolated incident should not be given significant weight.

Defendant is correct that not all evidence of actual confusion is entitled to significant weight. Evidence of "chronic mistakes and serious confusion" is attributed significant weight. *See Homeowners, 931 F.2d at 1110*. However, isolated instances of confusion are entitled to little or no weight. *See id.; Champions Golf Club*, 78 F.3d at 1120 ("[F]our incidents is not a considerable quantum of evidence of actual confusion, and minimal or isolated instances of actual confusion are, obviously, less probative than a showing of substantial actual confusion."). Here, not only is the single isolated incident of confusion insufficient to support a finding that confusion is likely, the fact that TailGate has presented only one incident actually weighs slightly against finding a likelihood of confusion. TailGate first began to use the TailGate Mark in 2013, and Boulevard rebranded its pale ale to include the Pale Ale Image in approximately the spring of 2016. (Doc. No. 1 at 13). If, as TailGate suggests, the parties actually "compete directly," and sell identical goods with labels that give "virtually identical" impressions (Doc. No. 4 at 15-16), the fact that Plaintiff can cite only a lone incident of actual confusion suggests that there exists no likelihood of confusion. Accordingly, although the Court is appropriately on guard against attributing excessive significance to the absence of actual-confusion evidence, this factor slightly favors Boulevard.

v. Marketing Channels Used

To determine whether the parties have overlapping marketing channels such that a buyer could encounter both products, courts compare how parties market their products and the parties' main customers. *Kibler v. Hall*, 843 F.3d 1068, 1079 (6th Cir. 2016). "The more channels and

buyers overlap, the greater the likelihood that relevant customers will confuse the sources of the parties' products." *Id.* at 1079.

TailGate alleges that the parties use the same marketing channels because they both utilize an online store to sell merchandise and reach consumers through social media. (Doc. No. 4 at 16). Boulevard argues that a general reference to marketing over the Internet and the use of social media is insufficient to show common marketing channels. Boulevard is correct. A plaintiff cannot show a likelihood of confusion by generally alleging that both parties market their goods through the Internet or social media. *See Therma-Scan*, 295 F.3d at 637; *Kibler*, 843 F.3d at 1080. In order to determine whether certain online marketing could support a finding of likely confusion, courts in the Sixth Circuit examine the following: (1) whether both parties use the Internet as a substantial marketing channel; (2) whether the parties' marks are used with web-based products; and (3) whether the parties' marketing channels overlap in any other way. *Kibler*, 843 F.3d at 1079.

As an initial matter, there is no significant overlap in the specific online marketing channels the parties use. As Boulevard posits, although it and TailGate each sell on the Internet merchandise displaying their respective logos, each does so only through its own independent website. In addition, at the Preliminary Injunction Hearing, evidence was introduced that the TailGate Mark is not visible on merchandise sold thought TailGate's online store unless a buyer clicks on a specific product to enable a successive view. Regarding the three factors outlined by the Sixth Circuit, first, although there was testimony at the Preliminary Injunction Hearing that each party had an online store, the record is inadequate to support a finding that both parties use the Internet as a substantial marketing channel; the kind of facts that would incline the Court to find the use of

the Internet as a marketing channel to be "substantial" are simply missing.[7] Second, it is clear that although the parties' respective marks are printed on merchandise available for purchase through online stores, the parties' main product (beer) is not web-based. Finally, the parties do not appear to have other marketing channels that overlap in any other way. Accordingly, because there is no evidence that the parties' advertising methods or targeting of customers substantially overlap beyond the general use of the Internet and social media, the marketing-channels factor favors Boulevard.

vi. Likely Degree of Purchaser Care

Courts assessing the degree of purchaser care consider whether the "typical buyer exercising ordinary caution" would differentiate between products with similar trademarks. *Daddy's Junky Music*, 109 F.3d at 285. Generally, if consumers exercise less care because they are purchasing relatively inexpensive products, the factor weighs in the plaintiff's favor. However, the factor weighs in the defendant's favor where consumers exercise greater care because they are purchasing more expensive products. *See Homeowners*, 931 F.2d at 1111.

According to TailGate, "in the craft beer industry, consumers will likely know what they want and have a strong feeling about the beer that they consume." (Doc. No. 4 at 16). The Court finds no reason, based on conventional wisdom or the evidence at the Preliminary Injunction Hearing, not to take TailGate at its word here. But this actually hurts TailGate's position by

---

[7] During the Preliminary Injunction Hearing, Boulevard conceded that TailGate is a prodigious poster on social media. This alone, however, is insufficient to show that TailGate uses the Internet as a substantial marketing channel. The Court does not know, *inter alia*, how many consumers TailGate's social media posts reach or even what kind of social media TailGate utilizes. Further, TailGate has presented no evidence that Boulevard uses social media as a substantial marketing channel.

suggesting that craft beer consumers will exercise greater care, a circumstance that, as noted above, favors a defendant. Accordingly, the high degree of purchaser care weighs in Boulevard's favor.

vii.   Defendant's Intent in Selecting the Mark

"If a party chooses a mark with the intent of causing confusion, that fact alone may be sufficient to justify an inference of confusing similarity." *See Homeowners*, 931 F.2d at 1111. Direct evidence of copying is not necessary to prove intent. *See Wynn Oil Co. v. Am. Way Serv. Corp*, 943 F.2d 595, 603 (6th Cir. 1991). Rather, "[c]ircumstantial evidence of copying, particularly 'the use of a contested mark with knowledge of the protected mark at issue,' is sufficient to support an inference of intentional infringement where direct evidence is not available." *Therma-Scan*, 295 F.3d at 638-39 (quoting *Champions Golf Club*, 78 F.3d at 1121). Intent "is an issue whose resolution may benefit only the cause of a senior user, not of an alleged infringer." *Daddy's Junky Music*, 109 F.3d at 287.

TailGate argues that Boulevard intends to use the Pale Ale Image to capitalize off of TailGate's reputation, innovation, and success. (Doc. No. 4 at 17). Boulevard claims that it has no need to capitalize off of those things because—as the recipient of the 2011 gold medal at the Great American Beer Festival in Category 48: International-Style Pale Ale— Boulevard Pale Ale is an award-winning beer. (Doc No. 41 at 13). Boulevard also claims that it has no need to capitalize off of the reputation of TailGate because "Boulevard and DUSA have been recognized as among the best craft brewing companies in the United States." (Doc. No. 41 at 13). Moreover, Boulevard claims that no one at Boulevard or Boulevard's parent company, Duvel Moortgat USA, Ltd. ("DUSA"), had heard of TailGate until Mr. Kegan began contacting Boulevard about the alleged infringement. (Doc. No. 41 at 20). The Court finds these justifications credible.

In addition, Boulevard argues that the reason the Pale Ale Image was created was to represent the first sale of Boulevard Beer in 1989, which was delivered to a local Kansas City restaurant in a keg in the back of a pickup truck. (Doc. No. 41 at 12). To that end, Boulevard offered at the Preliminary Injunction Hearing a collection of documents from the file of Boulevard's graphic designer and creative director, Payton Kelly. Among these documents were emails and designs evidencing the progress and steps Boulevard took in creating the Pale Ale Image. (Defense Exhibit No. 40). The Court believes that these documents support Boulevard's argument that the Pale Ale Image was designed with the intent of representing Boulevard's first delivery of Pale Ale rather than with the intent of infringing on the TailGate Mark. Although TailGate argues that Boulevard had access to the TailGate Mark through TailGate's website for purposes of the copyright claim, TailGate does not otherwise provide any evidence suggesting that Boulevard was aware of the TailGate Mark prior to Mr. Keegan's communications. Rather, the evidence and circumstances mentioned above support a finding that Boulevard did not select and use the Pale Ale Image with the intention to capitalize on the value of the TailGate Mark. Because the Court determines that "defendant had only good intentions in adopting its name, it . . . find[s] that this lack of intent neither reduces nor increases the probability of consumer confusion." *Daddy's Junky Music*, 109 F.3d at 287. Accordingly, this factor is neutral.

viii.   Likelihood of Expansion of the Product Lines

"A strong possibility that either party will expand its business to compete with the other's increases the likelihood of consumers confusing the sources of the parties' products." *Kibler*, 843 F.3d at 1082. The possibility of expansion cannot be merely speculative, a party must present "evidence that demonstrates a strong possibility that one party will expand to compete with the

other." *AutoZone*, 174 F. Supp. 2d at 733. Where a plaintiff does not put forth evidence of either parties' significant expansion plans, this factor will be neutral. *See Maker's Mark*, 679 F.3d at 424.

TailGate alleges that this factor weighs in its favor because it is "actively and systematically working to continue growing its brand." (Doc. No. 4 at 17). In support of this argument, TailGate cites to the following statement in the Keegan Declaration:

> TailGate has a reputation of bringing innovative and experimental beers to its customers. We are actively working to expand the TailGate brand by reaching into new markets throughout the United States and worldwide. We understand the need to be strong and grow the local market to be the best brewery anywhere.

(Doc. 4-1 at 30). At the Preliminary Injunction Hearing, Mr. Keegan testified that TailGate does, in fact, have plans to expand outside of Tennessee and that TailGate has talked to a number of different distributors but to date has decided not to follow through with any expansion. He said that he had recently been approached to absorb a facility in Mobile, Alabama, but nonetheless does not have any current agreements to distribute TailGate Beer outside of Tennessee, does not own property interests outside of Tennessee, and has not shipped TailGate Beer outside of Tennessee.[8] As for Boulevard's likelihood of expanding sales of its Pale Ale into Tennessee, TailGate alleges that Boulevard's Pale Ale is listed on the Tennessee Department of Revenue's Approved Beer List and Boulevard's Pale Ale is available as part of its beers available for distribution in Tennessee, including in Davidson and Williamson County. (Doc. No 47 at 4-5). In response, Boulevard testified that DUSA has never and has no intent to sell in the future Boulevard Pale Ale Beer in Tennessee.

---

[8] Although Mr. Keegan did not testify during the Preliminary Injunction Hearing that TailGate distributes its beer in the UK or Sweden, he did testify regarding such international distribution during his deposition. (See Doc. No. 41-11 at 6; Doc. No. 41 at 7).

The Court finds that TailGate's vague references to its general plan to expand in the future are too speculative to show significant expansion plans. Additionally, the Court finds credible Boulevard's testimony that it does not plan to sell Boulevard Pale Ale in Tennessee in the future. Accordingly, this factor is neutral.

### ix. Balancing the Factors

As the Sixth Circuit has held, "in the course of applying the *Frisch* factors, '[t]he ultimate question remains whether relevant consumers are likely to believe that the products or services offered by the parties are affiliated in some way.'" *Progressive Distribution*, 856 F.3d at 436. Here, excluding neutral factors, the majority of the factors—strength of the TailGate's mark, similarity of the marks, evidence of actual confusion, marketing channels used, and likely degree of purchaser care—favor Boulevard. Consideration of these factors compels the conclusion that TailGate has not demonstrated a likelihood of confusion and thus has not demonstrated a strong likelihood of success on the merits of its trademark infringement claims.[9]

### B. Copyright Infringement

TailGate also moves for preliminary injunctive relief on the basis of Boulevard's alleged copyright infringement of the Copyrighted TailGate Logo. To establish a claim for copyright infringement, a plaintiff must establish "(1) ownership of a valid copyright; and (2) copying of constituent elements of the work that are original." *Bridgeport Music, Inc. v. WM Music Corp.*,

---

[9] Because the Court finds that the public is unlikely to be confused by the marks at issue, TailGate has not shown a likelihood of success as to its claim for false designation of origin under section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *See AmMed Direct, LLC v. Liberty Med. Supply, Inc.*, Case. No. 3:09-00288, 2009 WL 3680539, at *5 (M.D. Tenn. Sept. 23, 2009) ("In order to obtain injunctive relief under section 43(a) of the Lanham Act, a plaintiff must show that a "likelihood of confusion" exists among consumers with regard to the parties' trademarks.").

508 F.3d 394, 398 (6th Cir. 2007) (quoting *Stromback v. New Line Cinema*, 384 F.3d 283, 293 (6th Cir. 2004)).

The first prong, which tests the originality and non-functionality of the work, is presumptively established by the copyright registration. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004). "The second prong tests whether any copying occurred (a factual matter) and whether the portions of the work copied were entitled to copyright protection (a legal matter)." *Id.* (citing *Kepner–Tregoe, Inc. v. Leadership Software, Inc.*, 12 F.3d 527, 534-35 & n.14 (5th Cir. 1994)). For the reasons discussed below, the Court finds that TailGate has not established a likelihood of success on the merits as to its copyright infringement claim.

### i.  Ownership

TailGate attached to its Complaint a certificate of registration for the Copyrighted TailGate Logo and the TailGate Beer website. (Doc. No. 1-3). TailGate's timely registered copyrights are entitled to a "presumption of validity." 17 U.S.C. § 410(c) (stating that a valid certificate of registration constitutes "prima facie evidence of the validity of the copyright and of the facts stated in the certificate"). Boulevard does not contest TailGate's ownership of the Copyrighted TailGate Logo. Accordingly, the ownership prong is satisfied.

### ii.  Infringement

Boulevard does, however, dispute that its use of the Pale Ale Image amounts to an infringement of TailGate's valid copyright. (Doc. No. 41 at 19). In order to satisfy the second prong of a copyright infringement claim, a plaintiff may show either direct evidence that the defendant copied the work or, in the absence of proof of actual copying, indirectly by showing that (1) the defendant had access to the plaintiff's work and (2) that there are substantial similarities

between the defendant's and plaintiff's works. *Robert R. Jones Assocs., Inc. v. Nino Homes*, 858 F.2d 274, 276-77 (6th Cir. 1988).

TailGate does not present direct proof of copying but rather argues that Boulevard had access to the copyrighted work and that there are substantial similarities between the Copyrighted TailGate Logo and the Pale Ale Image. TailGate contends that Boulevard had access to the Copyrighted TailGate Logo because TailGate has used the Copyrighted TailGate Logo to brand its products since it was issued the copyright in 2010. (Doc. No. 4 at 19). The Copyrighted TailGate Logo has been printed on TailGate's beer, website, and other products that it sells. Because Boulevard sells other beers in the Nashville area, TailGate argues, there is a reasonable probability that Boulevard had access to the Copyrighted TailGate Logo. (*Id.*). Boulevard disputes that it had access to the Copyrighted TailGate Logo. Regardless, the Court need not reach the issue of access because it finds that the Copyrighted TailGate Logo and the Pale Ale Image are not substantially similar. *See Wickham v. Knoxville Int'l. Energy Exposition, Inc.*, 739 F.2d 1094, 1098 (6th Cir. 1984) (affirming district court's finding that there existed no substantial similarity between copyrighted works while declining to resolve the access issue); *see also Small v. Exhibit Enters., Inc.*, 364 F. Supp. 2d 648, 652 (E.D. Mich. 2005) ("While a showing of access by the Plaintiffs is required, no amount of proof of access will suffice to show copying if there are no similarities between the two disputed works.").

The substantial similarity factor is broken down into two parts: first, the court must determine which portions of the original work are truly original and protected by copyright law; and second, "the trier of fact evaluate[s] similarity [of those particular portions] from the viewpoint of the ordinary observer." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp. 2d 853, 865 (S.D. Ohio 2008) (citing *Kohus v. Mariol*, 328 F.3d 848, 854 (6th Cir. 2003)).

In determining which elements of the work are protected by copyright law, courts consider whether the elements are truly original such that they amount to creative expressions of ideas. *See Kuhos*, 328 F.3d at 855; *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 375 (1991) ("Original . . . means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at lease some minimal degree of creativity."). "[A]bstract ideas are not protectible, but the expression of an idea is." *Kuhos*, 328 F.3d at 855. Also unprotected by copyright law are *scenes a faire*, *i.e.*, "those elements that follow naturally from the work's theme, rather than from the author's creativity, or elements that are dictated by external factors such as particular business practices." *Id.* (internal citations and quotation marks omitted).

Here, the elements that TailGate asks the Court to consider include the use of a pickup truck with a lowered tailgate, the angle of the parked truck, and the beer keg positioned in the bed of the truck. (Doc. No. 4 at 20). First, the Court finds that the "idea" of a truck is not protected by copyright. *See Wickham*, 739 F.2d at 1097 ("Ideas are not protected by copyright, only expressions of ideas."). TailGate's particular truck, however, is a protectable element of the Copyrighted TailGate Logo. The original design elements of the truck render it original such that it is entitled to copyright protection. Second, the angle of the parked truck is not a protectible element. Elements are not protectible when they depict the natural portrayal of an inanimate object. *See, e.g., The Bandana Co., Inc. v. TJX Companies*, Case No. 05-206, 2005 WL 1201176, at *2 (W.D. Ky. May 29, 2005) ("[M]any elements are not protectible because they depict naturally occurring postures or positions. No copyright protection may be afforded to elements of expression that naturally flow from the idea of an animal sculpture."). To find that the position of TailGate's truck is a protected element of a copyrighted image would imply that the profile of a truck, or trucks pictured straight

on and from the back are protectible elements of a copyrighted work. Finally, the Court finds that the depiction of the keg in the bed of the truck is not a protectable element of the Copyrighted TailGate Logo. In *Winfield Collection, Ltd. v. Gemmy Indus., Corp.*, 147 F. App'x 547 (6th Cir. 2005), the Sixth Circuit considered what level of generality is protected with regard to a witch's cape, black clothing, bent hat, and perpendicular broom. *Id.* at 555. The court held that such elements were "too generalized by themselves to warrant protection, although the particular capes, clothing, hats or brooms could theoretically be similar enough to constitute infringement." *Id.* Here, although a substantially similar keg could theoretically be protected, the idea of a keg in a truck is too generalized to warrant copyright protection.[10]

The second part of the substantial-similarity analysis requires the court to determine whether elements of the defendant's works are substantially similar to the protectible elements of the plaintiff's creations from the viewpoint of the intended audience. *Kohus*, 328 F.3d at 587. Here, the intended audience is the lay observer or "ordinary reasonable person." *Id.* Because the Court finds that only TailGate's particular truck is a protected element of the Copyrighted TailGate Logo, it need address only whether there is substantial similarity between the parties' respective trucks.

According to Tailgate, the combination of the truck parked in the same manner with its tailgate lowered, featuring a keg in the bed of the truck from the Copyrighted TailGate Logo in the Pale Ale Image render the images substantially similar. TailGate does not analyze these elements individually, perhaps because so doing would not support its position. Although throughout its

---

[10] Even if a keg in a truck were to be considered a protectible element of copyright, the Court finds that the kegs themselves are not substantially similar. As Boulevard points out, "the Tailgate Mark us[es] a modern stainless steel Sanke keg without a wooden bone and with a picnic pump at the top and the [Pale Ale Image] us[es] an old-style aluminum Hoff Stevens keg with a wooden bone in the center." (Doc. No. 41 at 11). Although Boulevard does not explain what a "picnic pump" is, the Court understands it to be a tap. And although Boulevard does not explain what a "wooden bone" is, the Court understands it to be a hole in the vertical middle (rather than on top) of the keg.

briefing and during the Preliminary Injunction Hearing TailGate generally alleged that Boulevard is using "our truck," it does not explain how the trucks are similar beyond their angle and the keg in the back. Boulevard, on the other hand, disputes that the truck or keg are actually similar. Specifically, Boulevard states that the make and models of the trucks are different, the tires are different, the windshields differ in style, the "TailGate Beer" decal appears in the back windshield of the TailGate Mark, the Pale Ale Image has a license plate whereas the TailGate mark does not, and the taillights differ. (Doc. No. 41 at 11). The Court, considering the prospective of the intended audience, finds that these images are not substantially similar. Rather, the Court finds persuasive the plethora of differences between the two trucks identified by Boulevard and described above.

Therefore, the Court finds that TailGate has not shown a likelihood of success on the merits of its claim of copyright infringement.

2. Irreparable Harm

Because TailGate has failed to show a likelihood of success on the merits, irreparable injury is not presumed. *See PGP, LLC v. TPII, LLC*, 734 F. App'x 330, 334 (6th Cir. 2018). Therefore, TailGate must demonstrate that absent an injunction, it will likely suffer irreparable injury.[11] Harm that is merely speculative is insufficient. *See Winter*, 555 U.S. at 22. "A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages." *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012). "In order to substantiate

---

[11] The Sixth Circuit does not require an independent finding of irreparable harm where the plaintiff has established that there is a likelihood of confusion, because "irreparable injury 'ordinarily follows when a likelihood of confusion or possible risk to reputation appears' from infringement or unfair competition." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006). Here, because the Court has found that there is no likelihood of confusion, TailGate must establish that it will likely suffer irreparable harm as the second element of its request for a preliminary injunction. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20-21 (2008) ("A plaintiff seeking a preliminary injunction must establish that . . . he is likely to suffer irreparable harm in the absence of preliminary relief.").

a claim that irreparable injury is likely to occur, a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991).

TailGate argues that, absent a preliminary injunction, it will suffer loss of goodwill and damage to its reputation, and that those harms are irreparable. (Doc. No. 4 at 22). In its response, Boulevard presents four arguments as to why TailGate will not suffer irreparable harm. First, Boulevard argues that there is no likelihood of consumer confusion, as Boulevard does not sell its pale ale in Tennessee and there is no evidence that TailGate sells its beer outside of Tennessee. (Doc. No 41 at 21-22). The Court finds this argument persuasive. The Sixth Circuit has noted that irreparable injury "ordinarily follows when a likelihood of confusion or possible risk to reputation appears" from infringement or unfair competition. *Wynn Oil*, 943 F.2d at 608 (quoting *Koppers Co. v. Krupp–Koppers GmbH*, 517 F. Supp. 836, 849 (W.D. Pa. 1981)). With regard to alleged trademark violations, the risk of irreparable injury is clear if "members of the public are led to believe, mistakenly that [Boulevard's pale ale] [is] [TailGate's beer]," such that "[TailGate]'s reputation and goodwill will hinge on the quality of [product] outside its control." *Music City Metals Co. v. Jingchang Cai*, Case No. 3:17-cv-766, 2018 WL 2020794, at *11 (M.D. Tenn. Apr. 30, 2018). But as discussed above, Boulevard's use of the Pale Ale Image is not likely to cause confusion with TailGate's federally registered trademark. Because confusion is not likely, it is also unlikely that Boulevard's continuing use of the Pale Ale Image will cause TailGate to lose control over the quality of the goods that bear its mark or affect TailGate's reputation. *See Weyerhaeuser NR Co. v. Louisiana-Pacific Corp.*, Case No. 13-cv-805, 2013 WL 5331246, at *11 (M.D. Tenn. Sept. 23, 2013) (finding no irreparable harm where the court did not find a strong showing that there was likelihood of confusion).

Second, Boulevard argues that the Palegate Advertisement similarly will not cause confusion and therefore irreparable harm because the campaign was limited to customers in Missouri, Kansas, Nebraska, and Iowa. (Doc. No 41 at 21-22). The Court agrees that because the Palegate Advertisement was not directed to consumers residing in areas where TailGate beer was sold, it is likely that it did not cause confusion with TailGate's federally registered mark. More relevant to the irreparable harm inquiry, however, is the fact that TailGate is currently not and will not suffer irreparable harm absent a preliminary injunction with regard to the Palegate Advertisement because the Palegate Advertisement was a (now-completed) campaign of limited duration.

Third, Boulevard argues that TailGate has not presented evidence that Boulevard beer is lower quality than TailGate such that TailGate's reputation would be damaged by any confusion. (Doc. No. 4 at 22). The Court does not find this argument persuasive. In the Sixth Circuit, it is no defense to a claim of irreparable harm that the allegedly infringing product is equal or better quality. "In these cases, . . . , the harm stems not from the actual quality of the goods (which is legally irrelevant) but rather from [plaintiff's] loss of control over the quality of goods that bear its marks." *Lorillard Tobacco,* 453 F.3d at 382.

Finally, Boulevard argues that there cannot be irreparable harm, because Plaintiff has already proposed accepting payment in return for a license. (Doc. No. 4 at 22). At the Preliminary Injunction Hearing, TailGate suggested that—in conjunction with a preliminary injunction—it might consider allowing Boulevard three to four months to sell its existing affected merchandise and inventory. Although the Court applauds TailGate's willingness to negotiate, TailGate's proposal also suggests that a preliminary injunction is not necessary. And lest TailGate think that the Court is using its good-faith settlement offer (as to this aspect of injunctive relief) against it,

the Court hastens to add that essentially the same point could be made without any specific reference to TailGate's settlement offer: Mr. Keegan's testimony established that TailGate could tolerate at least several months without Boulevard ceasing use of its mark, so long as TailGate received financial compensation for such use. Based on this reality, the Court has difficulty seeing how it can conclude that TailGate cannot be made whole via eventual monetary damages for any improper use of its mark over the next nine or so months until trial. "A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2003).

Accordingly, the Court finds that TailGate is not likely to suffer irreparable harm absent a preliminary injunction. This factor weighs against the issuance of an injunction.

3.  Substantial Harm to Defendant and Others

"The third factor for a court to consider is 'whether the issuance of the injunction would cause substantial harm to others." *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007). "In considering this factor, the Court must (1) balance the harm [p]laintiff would suffer if its request for a preliminary injunction were denied against the harm [d]efendant would suffer if an injunction were to issue, and (2) assess the impact the preliminary injunction might have on relevant third parties." *Procter & Gamble Co. v. Georgia–Pacific Consumer Prods. LP*, No. 1:09–318, 2009 WL 2407764, at *10 (S.D. Ohio Aug. 3, 2009); *accord Trenton Corp. v. Superior Corrosion Control, Inc.*, No. 06–15699, 2007 WL 268792, at *6 (E.D. Mich. Jan. 25, 2007).

TailGate argues that third parties will not suffer any harm if the Court decides to issue a preliminary injunction. In its brief, TailGate does not address whether Boulevard is likely to suffer

harm. At the Preliminary Injunction Hearing, however, Mr. Keegan suggested that it would not be expensive for Boulevard to change its imagery, as evidenced by a recent campaign Boulevard ran that printed individuals' names on the top of their beer cans. Nevertheless, recognizing that a preliminary injunction immediately enjoining Boulevard from selling its current inventory with the Pale Ale Image would cause Boulevard to suffer substantial harm,[12] TailGate offered to allow Boulevard three to four months to sell down its current Pale Ale inventory. Although Boulevard argues that "Defendants would be grievously harmed if this Court were to impose an injunction that barred all sales of Boulevard Pale Ale and merchandise bearing the [Pale Ale Image]" (Doc. No. 41 at 23), Boulevard provides no evidence that it is likely to suffer substantial harm if it were permitted time to sell off its current Pale Ale inventory. *See Weyerhaeuser NR Co. v. Louisiana-Pacific Corp*, Case No. 13-cv-00805, 2013 WL 5331246, at *11 (M.D. Tenn. Sept. 23, 2012) (finding no substantial harm to others where defendant failed to provide evidence of the cost of rebranding). Accordingly, the Court finds that Boulevard would suffer substantial harm if its investment in such inventory were immediately nullified as a result of a preliminary injunction but cannot find the same if Boulevard were permitted time to sell down its inventory. *See Big Time Worldwide Concert & Sport Club at Town Center, LLC. v. Marriott Intern., Inc.*, 236 F. Supp. 2d 791, 807-08 (E.D. Mich. 2003) (finding the issuance of an immediate preliminary injunction would cause substantial harm to defendant where defendant submitted evidence showing the extent of its investment in advertising and inventory containing the allegedly infringing mark). Nonetheless,

---

[12] Boulevard has invested substantial sums in the Pale Ale Image. According to Boulevard, the losses it would endure as a result of the beer it would have to recall and discard, refunds it would be obligated to pay, and the labels it would need to reprint meet or exceed a million dollars. (Doc. No. 41 at 24). Specifically, as of July 2018, Boulevard had $277,540 of Boulevard Pale Ale inventory and $40,803 of packaging goods, including printed cans, labels, cartons, and wraps. (Doc. No. 41-19 at 1).

because TailGate has shown no likelihood of irreparable harm this factor either balances slightly in favor of Boulevard or is neutral—depending on the amount of time Boulevard were permitted to sell off its inventory.

4. Public Interest

Finally, TailGate argues that the public interest favors granting the injunction because doing so would prevent consumer confusion and protect the rights a party has in its trademark and copyright. But the Court has found that there is no likelihood of confusion. Accordingly, this factor does not support the issuance of a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the Court will **DENY** TailGate's Motion for Preliminary Injunction. In making this determination, the Court does not suggest that TailGate will be unable to prevail at trial or that any decision here constitutes any law of the case. *See Cold Heading Co. v. B&D Thread Rolling, Inc.*, No. 2:11-CV-15189, 2012 WL 13008688, at *13 (E.D. Mich. June 5, 2012), *adopted by*, No. 11-15189, 2012 WL 13012405 (E.D. Mich. July 19, 2012); *Bronson v. Board of Educ. of the City Sch. Dist. of Cincinnati*, 550 F. Supp. 941, 945 (S.D. Ohio 1982) ("[B]ecause the nature of findings made in connection with a preliminary injunction are inherently tentative, it is apparent, under established authority, that findings made on motions for preliminary injunctions do not estop the parties at the trial on the merits, and are neither determinative of the issues in the case, nor binding upon the parties or the Court at a subsequent trial.").

An appropriate ordered will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE